United States Court of Appeals
Fifth Circuit

**F I L E D**

May 4, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

No. 05-30098

PIAZZA'S SEAFOOD WORLD, LLC,

Plaintiff-Counter Defendant-Appellee,

VERSUS

BOB ODOM,
Individually and as Commissioner of the Louisiana Department of
Agriculture and Forestry,

Defendant-Counter Claimant-Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, DeMOSS, and OWEN, Circuit Judges.

DeMOSS, Circuit Judge:

This case requires us to decide the constitutionality of two Louisiana statutes, one that regulates the labeling of catfish, LA REV. STAT. ANN. § 3:4617(C) (the "Catfish Statute"), and another that regulates the use of the word "Cajun" on food products, *id.* at § 3:4617(D), (E) (the "Cajun Statute"). Appellee Piazza's Seafood World, LLC ("Piazza") is a Louisiana company that imports seafood and distributes it under the trade names "Cajun Boy" and

"Cajun Delight." It sued the Commissioner of the Louisiana Department of Agriculture and Forestry, Mr. Bob Odom, to enjoin the Commissioner from enforcing the Catfish and Cajun Statutes against the company. The district court granted summary judgment in Piazza's favor with respect to the statutes and enjoined the Commissioner from enforcing either statute against Piazza, concluding (1) that the Catfish Statute was preempted by 21 U.S.C. § 343(t) and (2) that the Cajun Statute, as applied to Piazza, violated the First Amendment. The district court also denied the Commissioner's motion for new trial regarding the Catfish Statute, which the court treated as a motion to reconsider, reiterating that the Catfish Statute was preempted and finding in the alternative that it violated the dormant Foreign Commerce Clause. For the reasons stated below, we affirm.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case represents the next chapter in an ongoing saga regarding the labeling of catfish. In May 2002, Congress passed legislation limiting the class of fish sold in interstate commerce to which the label "catfish" could be applied. *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 10806(a), 116 Stat. 134, 526-27 (codified at 21 U.S.C. §§ 321d, 343(t)). This legislation was prompted by increased sales of Vietnamese *Pangasius bocourti* in the United States as "basa

2

catfish." *See* Kerrilee E. Kobbeman, Legislative Note, *Hook, Line and Sinker: How Congress Swallowed the Domestic Catfish Industry's Narrow Definition of this Ubiquitous Bottomfeeder*, 57 ARK. L. REV. 407, 411-18 (2004); *see also* 148 CONG. REC. S3989 (daily ed. May 8, 2002) (statement of Sen. Hutchinson) ("With this provision, we were trying to end the deceptive and economically destructive practice of mislabeling Vietnamese basa . . . ."); 147 CONG. REC. H6267-68 (daily ed. Oct. 4, 2001) (statements of Reps. Barry, Pickering, and Shows) (describing the purposes behind the legislation). The American catfish industry was heavily impacted by the sale of these fish under the catfish name: sales of domestic catfish dropped significantly and domestic catfish farmers were forced to lower their prices. Kobbeman, *supra*, at 411-12; *see also* 147 CONG. REC. H6267-68 (statements of Reps. Barry, Pickering, and Shows) (detailing the impact of foreign catfish on the American market). The new federal catfish labeling law, codified at 21 U.S.C. §§ 321d and 343(t), provided that the term "catfish" could only be considered "a common or usual name (or part thereof) for fish classified within the family *Ictaluridae*"; "only labeling or advertising for fish classified within that family" could use the term "catfish"; and a food would be deemed misbranded if it purported to be or was represented as catfish, unless it was fish classified within

the family *Ictaluridae*. 21 U.S.C. §§ 321d, 343(t). After this legislation was passed, Vietnamese *Pangasius bocourti*, members of the family *Pangasiidae*, could no longer be labeled catfish; only fish from the family *Ictaluridae*, native to America, could bear the lucrative catfish label.

Around the same time, Louisiana discovered that American *Ictaluridae* were being farmed in China and sold in the United States as catfish, and it passed legislation limiting further the class of fish to which the catfish label could be applied. 2002 La. Sess. Law Serv. 1st Ex. Sess. Act 125 (West). Specifically, Louisiana stated that only *Ictaluridae* grown in the United States could be labeled "catfish." LA. REV. STAT. ANN. § 3:4617(C) (2003).[1] This lawsuit arose out of application of that law, as well as a Louisiana law limiting the use of the word "Cajun" on food products, to an American importer and distributor of Chinese *Ictaluridae*.

Piazza is a Louisiana Limited Liability Company that has been selling seafood wholesale in Louisiana for more than fifty years; thirty years ago, it began marketing some of its products

---

[1] The legislation also defined fish from the family *Anarhichadidae* grown in the United States as catfish; however, that portion of the statute is not at issue in this case because according to the record, Appellee Piazza only sells *Ictaluridae*.

under the trade names "Cajun Boy" and "Cajun Delight,"[2] and today it sells all of its products under those names. Although Piazza originally sold mostly Louisiana seafood, ninety-nine percent of the food products it sells currently are imported from overseas. Its customers are largely institutional buyers that resell Piazza's products to wholesalers and restaurants, but Piazza sells about one percent of its products to grocery stores that resell its products directly to the public. One of the products Piazza sells is Cajun Boy-brand catfish from the family *Ictaluridae* that is imported from China.[3] The catfish and the "Cajun Boy" and "Cajun Delight" trade names are what is at issue in this case.

In March 2004, Commissioner Odom ordered several of Piazza's customers not to "sell, offer for sale, apply, move or remove" any of Piazza's products because the reference to "catfish" on Piazza's Chinese catfish violated Louisiana's Catfish Statute[4];

---

[2] Both trade names are registered with the Louisiana Secretary of State.

[3] The Chinese catfish are descendants of American catfish imported to China for farming purposes, and the parties agree that they are biologically identical to American catfish.

[4] The Catfish Statute read,
No one shall misrepresent the name, or type of any fruit, vegetable, grain, meat, or fish, including catfish, sold, or offered or exposed for sale, to any actual or prospective consumer. "Catfish" shall mean only those species within the family *Ictaluridae* . . . and grown in the United States of

as a result of this action, 30,000 cases of Piazza's catfish were seized.[5] Piazza brought suit, seeking an injunction against Commissioner Odom to prevent him from enforcing the Catfish Statute against the company. Piazza argued that the Catfish Statute was preempted by 21 U.S.C. § 343(t) and unconstitutional under the Commerce and Equal Protection Clauses. The district court eventually granted partial summary judgment in Piazza's favor as to the Catfish Statute, finding that the statute was preempted by 21 U.S.C. § 343(t) because of an actual conflict between the state and federal laws.[6] The court did not address Piazza's alternative constitutional claims regarding the Catfish Statute at that time, although it did mention that it saw potential Commerce Clause problems with the statute.

While the original suit was pending, the Louisiana legislature passed House Bill 891, which repealed the

---

America.
LA. REV. STAT. ANN. § 3:4617(C) (2003).

[5] These cases were later released for sale after Piazza agreed to stamp the word "Chinese" above the word "catfish" on each case. Each case was already marked "Product of China," and the parties do not dispute that Piazza has always marked its foreign products with their country of origin.

[6] Section 343(t) states,
A food shall be deemed to be misbranded--
If it purports to be or is represented as catfish, unless it is fish classified within the family *Ictaluridae*.
21 U.S.C. § 343(t).

"grandfather clause" in Louisiana's Cajun Statute that had previously protected the use of the word "Cajun" in a product name if that name was a trademark or trade name legally registered with the state of Louisiana as of May 15, 2003.[7] Without the protection of the grandfather clause, all of Piazza's inventory violated the Cajun Statute. Piazza accordingly amended its complaint in the district court, seeking a second injunction against Commissioner Odom, this one to prevent the Commissioner

---

[7] The Cajun Statute, prior to amendment, read,
D. No person shall advertise, sell, offer or expose for sale, or distribute food or food products as "Cajun", "Louisiana Creole", or any derivative thereof unless the food or food product would qualify for the ten percent preference for products produced, processed, or manufactured in Louisiana under R.S. 38:2251 and R.S. 39:1595. Food brought into and processed in Louisiana shall not be considered as food or food products made in Louisiana, for purposes of this Section, unless the food has been substantially transformed by processing in Louisiana.
E. No person shall advertise, sell, offer or expose for sale, or distribute food or food products that do not qualify under this Section for labeling as "Cajun", "Louisiana Creole", or any derivative thereof in any packaging that would lead a reasonable person to believe that the food or food product qualifies as "Cajun" or "Louisiana Creole" food or food products, as defined in this Section.
F. The provisions of Subsections D and E of this Section shall not infringe upon rights acquired pursuant to any trademark or trade name legally registered with the state of Louisiana as of May 15, 2003.
LA. REV. STAT. ANN. § 3:4617(D)-(F) (Supp. 2004). House Bill 891 repealed subsection (F).

from enforcing the Cajun Statute against Piazza.[8] Piazza argued that the Cajun Statute was unconstitutional under the First Amendment and the Commerce, Equal Protection, Due Process, and Takings Clauses. Around the same time, Commissioner Odom filed a motion for new trial as to the Catfish Statute. The district court again found in Piazza's favor, granting partial summary judgment in Piazza's favor as to the Cajun Statute--finding that the statute, as applied to Piazza, violated the First Amendment-- and denying the Commissioner's motion for new trial as to the Catfish Statute--reiterating that the Catfish Statute was preempted and finding in the alternative that it violated the dormant Commerce Clause by discriminating against foreign commerce.[9] The court never addressed Piazza's alternative constitutional claims regarding the Cajun Statute.

---

[8] Piazza originally amended its complaint to challenge the constitutionality of the repeal of Louisiana Revised Statutes § 3:4617(F), but later amended its complaint again to add a challenge to the constitutionality of the Cajun Statute itself, Louisiana Revised Statutes § 3:4617(D), (E).

[9] The district court correctly characterized and analyzed the Commissioner's Rule 59(a) motion for new trial as a Rule 59(e) motion to reconsider entry of summary judgment. *See Patin v. Allied Signal, Inc.*, 77 F.3d 782, 785 n.1 (5th Cir. 1996); *see also Harcon Barge Co. v. D & G Boat Rentals, Inc.*, 784 F.2d 665, 669-70 (5th Cir. 1986) ("'[A]ny motion that draws into question the correctness of a judgment is functionally a motion under Civil Rule 59(e), whatever its label.'" (quoting 9 MOORE'S FEDERAL PRACTICE ¶ 204.12[1], at 4-67 (1985))). For simplicity's sake, the Commissioner's motion for new trial is referred to as a motion to reconsider throughout the remainder of this opinion.

The Commissioner timely appealed the district court's denial of his motion to reconsider as to the Catfish Statute and its partial summary judgment as to the Cajun Statute.[10] He argues on appeal (1) that the district court erred in holding that the Catfish Statute is preempted by 21 U.S.C. § 343(t); (2) that the district court erred in reaching its alternate conclusion that the Catfish Statute violates the dormant Commerce Clause; and (3) that the district court erred in holding that the Cajun Statute, as applied to Piazza, violates the First Amendment.

## II. The Catfish Statute

Generally, this Court reviews the denial of a motion to reconsider for abuse of discretion. *Fletcher v. Apfel*, 210 F.3d 510, 512 (5th Cir. 2000). However, if a party appeals from the denial of a Rule 59(e) motion that is solely a motion to reconsider a judgment on its merits, *de novo* review is appropriate. *Id.* Considering Commissioner Odom's arguments on appeal, it is apparent that he "intended to appeal the merits of the underlying [summary] judgment," *id.*; accordingly, we review his claims regarding the Catfish Statute *de novo*.[11]

---

[10] The notice of appeal effectively stayed the proceedings in the district court, where a cross-claim under the Lanham Act, which is not discussed here, is pending.

[11] Neither party properly addresses the standard of review this Court should apply with respect to the motion to reconsider. The Commissioner frames his standard of review discussion as though he were directly appealing the motion for summary

The district court held that the Catfish Statute violated the dormant Commerce Clause because it was "a protectionist measure that discriminate[d] against foreign commerce in favor of local interests." We agree.

The Commerce Clause states that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. Although the Commerce Clause speaks only of Congress's power, it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 571-72 (1997); *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98-99 (1994); *Dennis v. Higgins*, 498 U.S. 439, 447 (1991); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988); *see also Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste*, 389 F.3d 491, 497 (5th Cir. 2004) (acknowledging the Supreme Court's dormant Commerce Clause jurisprudence). This negative aspect of the Commerce Clause applies both to the Foreign Commerce Clause ("Commerce with foreign Nations"), *see, e.g., Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1,

_____

judgment, which he is not. And Piazza does not discuss the appropriate standard of review at all. However, we, not the parties, determine the appropriate standard of review.

10

7-8 (1986), and to the Interstate Commerce Clause ("Commerce . . . among the several States"), *see, e.g., Camps Newfound/Owatonna, Inc.*, 520 U.S. at 571-72, although the scope of Congress's power to regulate foreign commerce, and accordingly the limit on the power of the states in that area, is greater, *see, e.g., Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue and Fin.*, 505 U.S. 71, 79 (1992) (noting that "the constitutional prohibition against state taxation of foreign commerce is broader than the protection afforded to interstate commerce, in part because matters of concern to the entire Nation are implicated" (citation omitted)); *Wardair Canada, Inc.*, 477 U.S. at 8 ("In the unique context of foreign commerce, we have alluded to the special need for federal uniformity: 'In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.'" (internal quotation marks and citation omitted)); *Japan Line v. Los Angeles*, 441 U.S. 434, 446 (1979) (stating that "a more extensive constitutional inquiry is required" in Foreign Commerce Clause cases because a state regulation may "impair federal uniformity in an area where federal uniformity is essential").

State regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate

commerce. *See, e.g., Or. Waste Sys., Inc.*, 511 U.S. at 98 (Interstate Commerce Clause); *Kraft Gen. Foods, Inc.*, 505 U.S. at 81 (Foreign Commerce Clause). Regulations that facially discriminate are virtually per se invalid, *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 575 (explaining that discriminatory regulations are strictly scrutinized); *Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 497 (same); *see also Kraft Gen. Foods, Inc.*, 505 U.S. at 81 ("Absent a compelling justification, . . . a State may not advance its legitimate goals by means that facially discriminate against foreign commerce."), whereas regulations that merely burden commerce are valid "unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Or. Waste Sys., Inc.*, 511 U.S. at 99 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

In the context of the Interstate Commerce Clause, if a state regulation is found to be nondiscriminatory, the court examines "the nature of the local interest and whether alternative means could achieve that interest with less impact on interstate commerce." *Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 501. "'If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest

12

involved, and on whether it could be promoted as well with a lesser impact on interstate activities.'" *Id.* (quoting *Pike*, 397 U.S. at 142). However, in the context of the Foreign Commerce Clause, other considerations come into play: nondiscriminatory state regulations affecting foreign commerce are invalid "if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1022 (5th Cir. 1989) (quoting *Japan Line*, 441 U.S. at 446).

Commissioner Odom focuses his arguments on appeal on the Interstate Commerce Clause. He argues that the Catfish Statute does not discriminate against interstate commerce because it does not meet any of the factors listed in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), namely, the Catfish Statute "does not prohibit or limit the flow of goods into the state, creates no barriers whatsoever against the importation of goods, does not place added costs on out-of-state goods, and does not distinguish between in-state and out-of-state companies in the wholesale or retail market." The Commissioner misses the point. The problem with the Catfish Statute is not that it discriminates against interstate commerce, but that it discriminates against foreign

13

commerce. And this discrimination appears on the face of the statute: the Catfish Statute treats domestic catfish differently from foreign catfish to the benefit of the former and the detriment of the latter. *See Or. Waste Sys., Inc.*, 511 U.S. at 99 (defining discrimination in the Commerce Clause context). Therefore, the Commissioner's citation to *Exxon Corp.* is inapposite. *Exxon Corp.* involved a statute that did not facially discriminate, *see Exxon Corp.*, 437 U.S. at 125 ("Plainly, the Maryland statute does not discriminate against interstate goods, nor does it favor local producers and refiners."); accordingly, the Court was using the factors cited by Commissioner Odom to determine whether the statute in question unduly burdened — or had a discriminatory effect on — commerce, *see id.* at 125-26. Those factors are irrelevant in a case involving facial discrimination.[12]

---

[12] The Commissioner cites other cases in his reply brief in support of his argument that the Catfish Statute does not discriminate against commerce. We are not persuaded by any. First, the Commissioner is wrong that the differential treatment of products, rather than entities, cannot qualify as discrimination. *See Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 269 n.8 (1984) ("[D]iscrimination between in-state and out-of-state goods is as offensive to the Commerce Clause as discrimination between in-state and out-of-state taxpayers."). Second, an absolute barrier to commerce is not required for discrimination to exist. *See, e.g., Or. Waste Sys., Inc.*, 511 U.S. at 96-100 & (finding patent discrimination where the statute in question simply applied a differential charge to out-of-state entities, and stating "the degree of a differential burden or charge on interstate commerce 'measures only the extent of the discrimination' and 'is of no relevance to the determination whether a State has discriminated

Commissioner Odom also challenges the district court's decision by arguing that Congress somehow condoned Louisiana's legislation. We recognize that Congress may permit a state to enact legislation that would otherwise violate the Commerce Clause, but its intent to do so must be "expressly stated." *New Orleans S.S. Ass'n*, 874 F.2d at 1022 (citing *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91-92 (1984)). "The fact that the state policy [involved] appears to be consistent with federal policy--or even that state policy furthers the goals we might believe that Congress had in mind--is an insufficient indicium of congressional intent. *S.-Cent. Timber Dev., Inc.*, 467 U.S. at 92. There is no express statement in either of the statutes cited by the Commissioner, § 343(t) or the Lanham Act, regarding the power of the states to enact catfish labeling legislation that discriminates against foreign commerce. *See* 21 U.S.C. § 343(t); Lanham Act, 15 U.S.C. § 1051 *et seq*. The Commissioner relies on his interpretation of the purposes of

---

against interstate commerce'" (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992)). Finally, a statute that facially discriminates does not have to otherwise burden commerce in order to be strictly scrutinized--the cases the Commissioner cites requiring a burden in addition to discrimination did not involve facial discrimination. *See id.* The overarching problem with Commissioner Odom's arguments is that he fails to recognize that the Catfish Statute's differential treatment of domestic catfish and foreign catfish to the benefit of the former and the detriment of the latter is, without more, facial discrimination subject to strict scrutiny.

§ 343(t) and the Lanham Act--to prevent the labeling of foreign fish as catfish and to prevent "initial interest confusion," respectively--to support his position that "federal law allows the actions employed by Louisiana," but even if we agreed with his interpretation of those statutes, his reliance on their purposes, rather than their express language, indicates that Congress has made no express statement regarding state catfish labeling laws that discriminate against commerce. A state statute that violates the Commerce Clause cannot be saved by a showing that it is consistent with the purposes behind federal law. *S.-Cent. Timber Dev., Inc.*, 467 U.S. at 92.

Because we find that the Catfish Statute discriminates on its face against foreign commerce, we presume that it is invalid. *See Kraft Gen. Foods, Inc.*, 505 U.S. at 81. To overcome this presumption, the Commissioner must demonstrate that the Catfish Statute serves a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. *New Energy Co. of Ind.*, 486 U.S. at 278; *see also Kraft Gen. Foods, Inc.*, 505 U.S. at 81. This the Commissioner has not done: Because he thinks the Catfish Statute does not discriminate, he only comes forward with evidence that the statute's burden is minimal in relation to its local benefits. This evidence, even if accepted as true, is not enough to satisfy the Commissioner's

16

heightened burden under strict scrutiny review. *See Camps Newfound/Owatonna, Inc.*, 520 U.S. at 582 (stating that because the appellant "made no effort to defend the statute under the *per se* rule," the Court would not address whether strict scrutiny was satisfied). Absent a compelling justification, which the Commissioner has not offered, the Catfish Statute is invalid. Because we find that the Catfish Statute violates the dormant Foreign Commerce Clause, we do not address whether it is preempted.[13]

## III. The Cajun Statute

This Court reviews grants of summary judgment *de novo*, applying the same standard as the district court. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 401 (5th Cir. 2005). Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Court views the evidence in a light most favorable to the non-movant. *Wheeler*, 415 F.3d at 401. The non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the

---

[13] We also do not address any of Piazza's alternative constitutional claims regarding the Catfish Statute.

17

non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322-23.

The Commissioner argues on appeal that Piazza's First Amendment rights were not violated by the Cajun Statute because Piazza's use of the word "Cajun" in its trade names is misleading and deceptive. He argues alternatively that even if the use of the word "Cajun" is not misleading or deceptive, Louisiana has substantial governmental interests in regulating use of that word that are directly advanced by the Cajun Statute, and the statute is narrowly tailored to achieve those goals. Piazza counters that the Cajun Statute, as applied to Piazza,[14] violates all four prongs of the relevant *Central Hudson* test and thus constitutes an impermissible restriction on Piazza's First Amendment right to use the "Cajun Boy" and "Cajun Delight" trade names.

*Central Hudson Gas v. Public Service Commission*, 447 U.S. 557 (1980), supplies the test for determining whether the government has permissibly regulated commercial speech:

> In commercial speech cases . . . a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For

---

[14]    Piazza clarified at oral argument that on appeal it is only challenging the statute as applied.

18

> commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson*, 447 U.S. at 566. The district court answered *Central Hudson*'s first two inquiries in the affirmative, finding (1) that Piazza's use of the "Cajun Boy" and "Cajun Delight" trade names was only potentially misleading, not actually or inherently misleading, because Piazza largely sells its products to wholesalers and it labels its products with their country of origin and (2) that Louisiana's interest in protecting Louisianans from misleading and deceptive uses of trade names was substantial. The district court then turned to whether the Cajun Statute directly advanced Louisiana's asserted interest in protecting Louisianans and whether the statute was more extensive than necessary to serve that interest. It answered this inquiry in the affirmative, finding that the state's interest in protecting Louisianans from deception was not enhanced by application of the state statute to Piazza because there was no deception present to be prevented. The court also found that the state statute was more extensive than necessary when applied to Piazza because it contained no exception for sellers like Piazza who disclose truthful information (country of origin) on their

19

food labels that eliminates the deceptive nature of the labeling. The court emphasized that the Cajun Statute was not facially invalid, only invalid as applied to Piazza.

Having carefully reviewed the record, the briefs, and the oral argument of the parties, we affirm the district court's decision as to the Cajun Statute essentially for the reasons stated by the district court.[15]

### IV. Conclusion

Accordingly, we AFFIRM the district court's decision to deny Commissioner Odom's motion for new trial as to the Catfish Statute and its decision to grant Piazza's motion for partial summary judgment as to the Cajun Statute.

---

[15] We do not address Piazza's alternative constitutional claims regarding the Cajun Statute.

HIGGINBOTHAM, Circuit Judge, concurring:


I concur for the reasons stated by the panel opinion and the  thoughtful opinions of the district court. I agree that the Louisiana Statute discriminates against foreign commerce.  As was the district court, however, I am persuaded that the preferable approach is to draw upon preemption doctrine.  The commerce power hardly lies dormant here. Congress has set down a detailed regulatory scheme addressing the subject of misleading descriptions  of the family relationships of catfish and how this kinship is to be described in their sale.  The arguments in this case supporting a finding of discrimination against foreign commerce and the justifications for its heightened review rest upon the dominance of federal power in matters of relations with foreign countries not on maintenance of a national economy by the quelling of sibling efforts to gain commercial advantage over sister states.